No. 02-563

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 85

STATE OF MONTANA,

      Plaintiff and Respondent,

  v.

MICHELLE LEE HERD,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
                In and for the County of Missoula, Cause No. DC 2001-37
                The Honorable John W. Larson, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

      Kenneth R. Olson, Attorney at Law, Great Falls, Montana

      For Respondent:

      Hon. Mike McGrath, Montana Attorney General, Jennifer Anders, Assistant
      Attorney General, Helena, Montana; Fred Van Valkenburg, Missoula County
      Attorney, Missoula, Montana

                        Submitted on Briefs:  February 18, 2004

                                 Decided:  April 6, 2004

Filed:

_____
                        Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Michelle Lee Herd appeals a sentencing condition imposed in the District Court Judgment which followed her plea of guilty to four counts of negligent homicide. We reverse and remand.

## ISSUE

¶2 Did the District Court err when it ordered, as a condition of her sentence for negligent homicide, that Herd be barred from driving for forty years?

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 On December 27, 2000, Herd was living near Seattle, Washington, when she received an emergency phone call from her father. He said her mother had suffered a stroke and would probably not live more than 48 hours. Herd and her sister departed around 9:30 that evening, driving Herd's Dodge Ram half-ton pickup truck toward Great Falls with urgency.

¶4 Herd drove through the night, traveling east on Interstate 90. In Idaho, she pulled over and slept for about two and a half hours. In Missoula, she and her sister exited the vehicle, stretched and purchased espresso drinks. Herd continued driving and exited onto Highway 200 at Bonner at about 9:00 a.m. on December 28.

¶5 Highway 200 has one lane of travel in each direction. Shortly past Bonner, Herd pulled into the westbound lane to pass another eastbound vehicle, and neglected to return to the eastbound lane after completing the pass. Coming around a curve about 15 miles after she had entered Highway 200, Herd met with a westbound 1968 Volkswagen Beetle driven

2

by Arundel Good, with her mother Stacy, her sister Kilty, and her brother Marcus, as passengers. Both vehicles swerved in an unsuccessful attempt to avoid a collision. They hit head-on and the Volkswagen caught fire. Its four occupants died. Herd and her sister suffered minor injuries.

¶6 Herd admitted that she had only slept two and a half hours out of the previous twenty-seven. She stated that, being accustomed to multi-lane highways, and having just exited a four-lane highway, she had gotten confused and did not realize she was in an oncoming lane of travel until she saw the approaching Volkswagen.

¶7 Herd was charged with four counts of Negligent Homicide pursuant to § 45-5-104, MCA (1999). She eventually pled guilty to the charges, pursuant to a Plea Agreement with the Missoula County Attorney's Office.

¶8 In the Plea Agreement, the State agreed to make several sentencing recommendations, including that Herd be given a twenty-year suspended sentence, and that she be barred from driving for five years, except in a bona fide emergency. At Herd's sentencing on February 25, 2002, the Deputy County Attorney made no specific recommendations outside of the terms set forth in the Plea Agreement. Two members of the Good family testified, and both recommended that her driving privileges be terminated.

¶9 At the sentencing and in its written Judgment entered April 26, 2002, the District Court sentenced Herd to concurrent twenty-year sentences on Counts I and II and concurrent twenty-year sentences on Counts III and IV, all suspended, with the two sets of concurrent sentences to be served consecutively. The District Court ordered Herd to enter and

3

successfully complete a pre-release program; to remain under the jurisdiction of the Adult Parole and Probation Bureau for the forty-year term; to pay $200 per month in restitution for the twenty-year term of Counts I and II; to not own or be in control of any firearms or deadly weapons for the next forty years; to not enter any bars or casinos for the next forty years; to not drink or possess alcoholic beverages for forty years; to obtain any counseling requested by her Probation Officer; and to submit to drug and alcohol testing at any time her Probation Officer has reasonable grounds to believe the test would disclose evidence of a probation violation. The District Court also ruled that Herd would be barred from driving during the entire forty-year term of the sentences. The District Court explained that it set the sentences to run consecutively specifically to prohibit Herd from driving for forty years.

¶10    Herd filed a motion for reconsideration regarding the length of the driving restriction, which was denied. She now timely appeals the driving restriction to this Court.

## STANDARD OF REVIEW

¶11    In *State v. Montoya*, 1999 MT 180, ¶ 15, 295 Mont. 288, ¶ 15, 983 P.2d 937, ¶ 15, we held that our standard of review of criminal sentences was properly confined to legality only. We noted that our previous standard of review--which was a two-tiered approach under which we reviewed sentences for both legality and abuse of discretion--was a "carry-over from the days when this Court reviewed all sentencing challenges, prior to the creation of the Sentence Review Division" (SRD). *Id.* Recently, we rejected a constitutional challenge to the statute limiting SRD review, thereby leaving some sentences unreviewable for severity. *State ex rel. Holt v. District Court*, 2000 MT 142, 300 Mont. 35, 3 P.3d 608.

4

As will be discussed below, we feel it is necessary at this time to identify and clarify the standard of review for those cases in which the appellant is not eligible for SRD.

## DISCUSSION

¶12     Did the District Court err when it ordered, as a condition of her sentence, that Herd be barred from driving for forty years?

¶13     When deferring imposition of sentence or suspending all or a portion of a sentence, district courts may impose reasonable restrictions or conditions on the offender.  Section 46-18-201(4), MCA (1999).  However, these restrictions and conditions must be reasonably related to the objectives of rehabilitation and the protection of the victim and society.  Section 46-18-202(1)(f), MCA (1999).

¶14     The District Court specifically found that Herd was a good prospect for rehabilitation.  It also found that she had led a law-abiding life for a substantial period before the collision, and that she was not likely to commit another crime.  Nonetheless, the District Court concluded that Herd should be barred from driving for forty years.

¶15     Herd argues that the District Court was unreasonable in prohibiting her from driving for the majority of her remaining life expectancy.  She points out that, while the District Court states she has a good chance at rehabilitation if she follows through on the Judgment, she has no meaningful chance at rehabilitation if she can never drive again.   The State argues that Herd may seek relief in this Court from an illegal sentence only, per the standard of review set forth in *Montoya*, and that this Court should decline to address issues of equity, as the reasonableness of a sentence is an inquiry within the purview of SRD.

¶16    The problem is that Herd is ineligible for sentence review before SRD.  Pursuant to § 46-18-903, MCA (1999), any person sentenced to one year or more in the state prison may apply to SRD for review of that sentence.  The jurisdiction of SRD thus extends only to those persons who are actually incarcerated, and does not extend to those persons given suspended sentences.  *Holt*, ¶ 8.  Because Herd's sentence was suspended, she does not meet the threshold SRD eligibility requirement.  As a result, if we apply *Montoya* strictly, the reasonableness of the driving condition imposed upon Herd will not be subject to review by either SRD or this Court.  As was pointed out in the dissent in *Holt*, a person in this situation may well be subjected to unreviewable conditions of sentence which are overly burdensome or harsh.  *Holt*, ¶ 22.

¶17    In other cases, we have held that a condition of sentence must have a nexus with the conviction in order for it to be a legal condition of sentence.  *State v. Smith*, 2001 MT 111, ¶ 14, 305 Mont. 298, ¶ 14, 27 P.3d 39, ¶ 14, *overruled on other grounds*, (no nexus between a felony theft conviction and parenting classes as a sentencing condition); *State v. Watson*, 2001 MT 143, ¶ 14, 306 Mont. 33, ¶ 14, 29 P.3d 1026 , ¶ 14 (no nexus between a conviction for assaulting a peace officer and a sentencing condition prohibiting socializing with females under age 19).  See also *State v. Ommundson*, 1999 MT 16, ¶ 11, 293 Mont. 133, ¶ 11, 974 P.2d 620, ¶ 11.  Herd concedes that there is a nexus between her sentencing condition and the underlying offense of negligent homicide which resulted from her lack of care while driving.  She asks this Court to determine whether a condition of sentence can bear a relationship to the underlying offense, yet exceed reasonableness in its harshness or duration.

6

¶18 District Courts are afforded broad discretion in criminal sentencing. *State v. Flanagan*, 2003 MT 123, ¶ 23, 316 Mont. 1, ¶ 23, 68 P.3d 796, ¶ 23. However, that discretion is not without limitation. To hold that we will not review any sentence beyond legality--including those sentences which by their very nature are ineligible for review by SRD--would be to leave any sentencing condition which bore an arguable nexus with the offense for which the defendant was committed beyond review if the offender is ineligible for SRD. We turn to our reasoning in *Montoya,* in which we discarded the two-tiered standard of review for criminal sentences, to determine if such a vacuum was ever intended or even contemplated.

¶19 In *Montoya*, we determined that, with the creation of SRD, it was inappropriate for this Court to review sentences for abuse of discretion, as equitableness, or severity, of a sentence was a matter for sentence review by the SRB. *Montoya*, ¶¶ 14-15. We did not, however, give any consideration in *Montoya* to those cases which would, by statutory directive, fall outside of SRD review. It was only later, when we examined the parameters of SRD's jurisdiction in *Holt*, that we observed that legislatively, SRD was restricted to review of sentences which included at least one year of actual incarceration. *Holt*, ¶ 8.

¶20 In *Montoya*, we stated, "Questions of the equity of a sentence fall under the purview of the Sentence Review Division, while this Court's review of a sentence is limited to questions of legality." *Montoya*, ¶ 12. We further explained that the use of an abuse of discretion standard was a "carry-over from the days when this Court reviewed all sentencing challenges, prior to the creation of [SRD]." *Montoya*, ¶ 15. We did not, at that time, have

7

a reason to consider whether or not § 46-18-901(2), MCA, limited an offender's access to SRD because Montoya was sentenced to more than one year of actual incarceration.

¶21    It was not until *Holt* was decided, one year after *Montoya*, that it came to our attention that SRD was rejecting review of a class of felony sentences. Upon examination of the language of § 46-18-903(1), we confirmed that SRD, indeed, was given authority by the legislature to review only those sentences which consisted of a year or more of actual incarceration. *Holt*, ¶ 8. The *Holt* holding remains consistent with our reading of § 46-18-901(3). The statutory jurisdiction of SRD remains as set forth by the legislature in Title 46, Chapter 18 of the Montana Code Annotated. "Any person sentenced to a term of 1 year or more in the state prison . . ." may apply for review of the sentence by SRD. Section 46-18-903(1), MCA (2001).

¶22    Nothing in *Montoya* suggests that it was our intent, in fashioning a "legality only" standard of review once SRD came into being, to leave those with unreasonable sentencing conditions but no term of incarceration without any remedy. Accordingly, we now take this opportunity to close this "no review" window by adopting a new hybrid standard of review for sentencing. Henceforth, if an offender is eligible for Sentence Review--in other words, if the offender is sentenced to one year or more of actual incarceration--this Court will continue to follow the standard as set forth in *Montoya* and review such a sentence for legality only. It will be left in these cases to SRD to review sentences for equity. However, if an offender is statutorily ineligible for SRD, then this Court will utilize the two-tiered approach which we employed prior to the creation of SRD. Upon request, we will review

8

such sentences for both legality *and* abuse of discretion.

¶23 We note that while *Montoya* overruled the previous two-tiered standard of review for sentencing, this Court has been inconsistent in the application of *Montoya's* "legality only" standard. See, for example, *State v. Clark*, 2000 MT 40, 298 Mont. 300, 997 P.2d 107, which used the two-tiered standard of review without distinguishment. We clarify here that we will limit the use of the two-tiered standard of review to only those cases, like Herd's, in which the offender is ineligible to have SRD review the sentence for equity.

¶24 We next apply this hybrid standard of review to Herd's appeal from the forty-year driving prohibition which the District Court imposed as one condition of her suspended sentence. First, we review her sentence for legality, or, in other words, to determine if it falls within the parameters of the statute. *Montoya*, ¶ 15. Herd does not claim that the sentence imposed by the District Court falls outside of the statutory parameters. She argues rather that the length of the driving suspension, while not explicitly forbidden by statute, is so excessive as to reach a level of unreasonableness. We agree that the District Court has the authority to impose a sentence which subjects Herd to court oversight for forty years. Significantly, the District Court's imposition of a forty-year probationary term has not even been challenged by Herd.

¶25 Next, we examine whether the District Court abused its discretion in imposing a forty-year driving ban upon Herd, under the facts of the case and in light of the District Court's findings as set forth in ¶14. We conclude that it did. The District Court's findings concerning the tragic circumstances under which this accident occurred, Herd's good

9

prospects for rehabilitation, and her law-abiding life, are simply irreconcilable with the imposition of a forty-year driving prohibition. This prohibition drastically inhibits Herd's ability to make a living, serve the needs of her family, and pay court-ordered restitution, thus impairing the very prospects for rehabilitation that the court noted as a factor in Herd's favor. Moreover, there is simply nothing in the record or the District Court's sentencing Order to suggest that such a prohibition was necessary for the protection of a victim or society as a whole. We therefore conclude that the District Court abused the discretion afforded it under § 46-18-202(1), MCA, when it imposed this lengthy restriction on Herd's ability to lawfully drive a motor vehicle.

¶26    The dissent suggests that, given the gravity of the consequences resulting from Herd's negligence, lack of incarceration alone is enough to make her sentencing conditions equitable, if not, in fact, a gift. *Dissent*, ¶ 36. To read the dissent, one would think that Herd had been given but one significant sentencing condition. In reality, the District Court imposed an extensive and onerous list of sentencing conditions, *see Supra*, ¶ 9, which will have a tremendous impact upon Herd's freedom and quality of life for the next forty years. Moreover, she faces the risk of a lengthy prison sentence should she violate any of these conditions. Notably, Herd does not challenge the imposition of any of these other sentencing conditions.

¶27    While the dissent argues that Herd's driving prohibition will not prevent her "from having a full and productive life," Dissent, ¶ 38, Herd argues, and we agree, that taking away her driving privileges for forty years is counter-productive to her rehabilitation. Herd will

10

have precious little opportunity to improve her station, or for that matter to pay restitution, when she is precluded from driving from her remote home to any prospective place of employment, or to any of the events in which her children are involved as they grow up.

## CONCLUSION

¶28    For the foregoing reasons, we reverse the condition of Herd's sentence which prohibits her from legally driving a motor vehicle for the next forty years and remand to the District Court for resentencing.

/S/ PATRICIA O. COTTER

We Concur:

/S/ JIM REGNIER

11

/S/ W. WILLIAM LEAPHART
/S/ JIM RICE
/S/ JAMES C. NELSON

Chief Justice Karla M. Gray dissenting.

¶29    I respectfully, but strenuously, dissent from the Court's opinion.  Under either standard discussed by the Court--that is, legality or abuse of discretion--I would affirm the District Court's sentencing condition restricting Herd's driving privileges during the 40-year suspended sentences.

¶30    One can readily sympathize with any person who receives tragic information relating to a family member's health.  I daresay this has happened to all of us, and probably more than once.  We all know, of course, that our judgment is easily impaired at such times, and that a lack of sleep compounds the problem exponentially.  Here, Herd received the news of her mother's stroke--and that her mother probably would not live more than 48 hours--in the evening hours in Seattle, Washington.  Her parents were in Great Falls, Montana, a driving time of approximately 12 hours from Seattle.  She faced a number of choices, including flying to Great Falls the following morning; getting some sleep and then setting out for the long drive; and setting out immediately for the overnight drive and doing so--as the Court observes--"with urgency."  Herd chose the latter.

¶31    By the time Herd exited the interstate onto Highway 200, she had been awake for approximately 24 hours, except for a 2½ hour nap off the interstate in Idaho.  Soon after driving onto the two-lane Highway 200, Herd passed a vehicle and remained in the passing lane.  Some 15 miles later, her vehicle hit another vehicle head-on, killing four people.  Herd ultimately pled guilty to four counts of negligent homicide.

13

¶32 The maximum sentence for each count of negligent homicide--representing each of the people killed by Herd's admitted negligent driving--is 20 years in prison, a fine of $50,000 or both. *See* § 45-5-104(3), MCA (1999). In other words, the District Court could have sentenced Herd to 80 years in prison. Instead, it sentenced her to concurrent 20-year sentences on Counts I and II, *all suspended*, and concurrent 20-year sentences on Counts III and IV, *all suspended*, but running consecutive to the other 20-year suspended sentences. The District Court also carefully, and deliberatively, conditioned each set of suspended concurrent 20-year sentences on Herd not driving a motor vehicle. It is clear from the Judgment that the court expressly did so to prevent Herd from driving a motor vehicle for a total of 40 years. The District Court made clear that it was holding Herd responsible and accountable for her four felony counts of negligent homicide, which resulted in four deaths, and stated that the prospects for Herd's rehabilitation are good *if* she follows through on the Judgment. The court also stated that, while incarceration was not necessary to serve the interests of justice and the needs of public safety, it was necessary for Herd to change her approach to life and its problems. Finally, the court noted that, while no incarceration was being ordered at that time, "[i]mprisonment would not create an excessive hardship on you or your family."

¶33 Herd appeals from the 40-year driving restriction. Relying on *State v. Ommundson*, 1999 MT 16, 293 Mont. 133, 974 P.2d 620, she asserts that sentencing courts do not have unfettered or unlimited authority to impose restrictions on suspended sentences. She is

correct, of course, but the facts upon which we based our conclusion in *Ommundson* do not support a conclusion here that the 40-year driving restriction must be reversed.

¶34    In *Ommundson*, the defendant pled guilty to felony DUI and received a 54-month commitment to the Department of Corrections for placement in an appropriate institution, all but 6 months suspended, on conditions including that the defendant participate in a sex offender treatment program. *Ommundson*, ¶ 1.  The condition was based on the defendant's multiple prior convictions for indecent exposure and a sex offender evaluation indicating that the defendant needed sex offender treatment.  *Ommundson*, ¶ 3.  We discussed the statutory requirements for "reasonable" conditions considered necessary for the "objectives of rehabilitation and the protection of the victim and society."  *Ommundson*, ¶ 5 (citations omitted).  We then concluded that a court's authority to impose conditions "is not without limit," determined that the sex offender treatment condition had no correlation to the underlying offense and did not advance the statutory rehabilitation or protection objectives, and reversed the condition.  *Ommundson*, ¶¶ 11-13.  Nothing in *Ommundson* requires a similar result here.

¶35    It is clear and undisputed in the present case that the 40-year driving restriction is directly related to the four negligent homicide offenses Herd committed.  Absent her driving under questionable conditions--little sleep and all night on unfamiliar roads--and impaired judgment--resulting from the tragic news of her mother's stroke--we must assume the four people she killed still would be alive.  Moreover, it is clear that the District Court was determined to rehabilitate Herd and protect society at the same time; not by incarcerating

15

her, but by giving her plenty of time to get her life and judgment under better control without the possibility of her killing other people as a result of her negligent driving.

¶36    Herd also argues the statutory "reasonable" conditions language, and urges that the restriction at issue here does not meet that limitation. The Court is persuaded that the driving restriction is unreasonable in its severity, but I could not disagree more. In my view, Herd's sentence is a "gift" in the context of the reality that four people died as a result of her conduct. The District Court imposed no incarceration, much less the available 80 years in prison. In exchange, the court imposed--among other things--a 40-year restriction on the privilege of driving a motor vehicle. In my view, the restriction is inherently reasonable and entirely legal. It cannot and does not support a reversal.

¶37    I am concerned that the Court is basing its conclusion regarding the driving restriction on a somewhat narrow look at the District Court's sentence and judgment. For example, at ¶ 14, the Court states "[t]he District Court specifically found that Herd was a good prospect for rehabilitation." What the District Court actually said about Herd's rehabilitative prospects is "I think the prospects of rehabilitating you are good *if* you follow through on this judgment[,]" necessarily including the 40-year driving restriction and all other conditions of the suspended sentences. Also in ¶ 14, the Court observes the trial court "found that [Herd] had led a law-abiding life for a substantial period before the collision, and that she was not likely to commit another crime." True again, but the District Court also determined that she committed four counts of felony negligent homicide and that a crime was not likely to recur *if* she successfully completed supervised probation--including meeting

16

the conditions imposed.  I submit that the Court's incomplete recitation of these facts leaves the reader with an incomplete and, therefore, misleading view of the District Court's sentence.

¶38    Finally, with regard to the driving restriction itself, the Court is persuaded by Herd's argument that "she has no meaningful chance at rehabilitation if she can never drive again." I am not.  It is no doubt true that life as most of us know it--or choose it--would be more difficult without the ability to drive a vehicle.  On the other hand, many people have never driven and it does not prevent them from having a full and productive life.  Some people use public transportation, others walk or ride bicycles, and still others ride with friends or family. The notion that rehabilitation is nearly impossible without the opportunity to drive a vehicle strikes me as nonsense, especially in light of the overall sentence imposed here.  The tradeoff of not driving for 40 years as opposed to incarceration for 80 years, for a person whose driving has killed four people, seems an easy and very reasonable one to me.

¶39    Finally, at ¶ 25, the Court concludes that the District Court abused its discretion in imposing the 40-year driving ban under the facts of the case and in light of its own statements about that court's findings in ¶ 14, which I addressed above.  The Court goes on to state that nothing of record suggests that such a prohibition is necessary for the protection of society as a whole.  Apparently the Court is willing to "overlook" the stark fact that Herd's negligent driving killed four people.  In my view, this is simply unsupportable.

¶40    For all the reasons stated, I dissent from the Court's opinion.  I would affirm the District Court.

/S/ KARLA M. GRAY


Justice John Warner joins in the dissent of Chief Justice Gray.


/S/ JOHN WARNER